IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SOUTHEASTERN LEGAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | FILE NO. 1:23-cv-03819-LLM |
| | ) | |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STATUS REPORT

Pursuant to this Court's October 30, 2023, Order, ECF No. 11, Plaintiff Southeastern Legal Foundation, Inc. (SLF), and Defendant National Archives and Records Administration (NARA) submit this Joint Status Report (JSR) addressing the three topics specified by the Court: (1) the status of the parties' negotiations over any narrowing of Plaintiff's FOIA request, (2) NARA's rates of processing and production of documents; (3) proposals for next steps in this case. The parties have met and conferred about the above topics. Plaintiff has proposed to narrow Plaintiff's FOIA Request to expedite production. The parties dispute the appropriate processing rate and whether NARA should produce any *Vaughn* indexes during processing and production, rather than only after production is complete. The parties present their positions separately below.

1

**PLAINTIFF'S REPORT**

1. **Status of the parties' negotiations over any narrowing of Plaintiff's FOIA request.**

At the time of the Court's October 30, 2023, Order, NARA estimated that there were approximately 82,000 pages potentially responsive to Plaintiff's FOIA Request. The 82,000 pages estimate represented approximately 5,125 documents (or hits) averaging an estimated 16 pages each. As a result of the parties' discussions, Plaintiff has been willing to narrow the scope of its FOIA request by applying 221 search terms (listed below).

The search terms Plaintiff has proposed to narrow its FOIA Request are:

- "Hunter Biden" or "Hunter" or "Hunt"
- Rob
- Hbiden
- "James Biden" or "James"
- "Robert Biden" or "Robert"
- "Robert Hunter"
- "Sara Biden" or "Sara"
- "Beau Biden" or "Beau"
- "Kathleen Biden" or "Kathleen"
- "Eric Schwerin" or "Eric; Schwerin"
- Chairman
- "Chairman Ye" or "Ye"
- "Jonathan Yi" or "Yi"
- Zhang
- "Patrick Ho" or "Ho"
- Burisma
- "Vadim Pozharskyi" or "Vadim" or "Pozharskyi"
- "Nikolai Zlochevsky" or "Nikolai" or "Zlochevsky"
- "Devin Archer" or "Devin" or "Archer"

- "Chris Heinz" or "Heinz" or "Hines"
- "Dimitri Firtash;" or "Dmitri" or "Firtash"
- "Gabriel Popiviciu" or "Gabriel" or "Popiviciu"
- "Mykola Zlochevsky" or "Mykola" or "Zlochevsky"
- "Viktor Yanukovych" or "Viktor" or "Yanukovych"
- "Peter Poroshenko" or "Poroshenko"
- "John Flynn" or "Flynn"
- "Logan Act"
- Yatsenyuk
- BSF
- "Boies Schiller Flexner" or "Boises"
- "Lukas Archer" or "Lukas"
- "John Kerry" or "Kerry"
- "Chris Heinz" or "Heinz"
- "Kyiv" or "Kiev"
- Mexico
- Romania
- Ukraine
- UKR
- Russia
- RUS
- Turkey
- China
- CCP
- Khazakhstan
- "Karim Massimov" or "Karim" or "Massimov"
- "Kenes Rakishev" or "Kenes" or "Rakishev"
- "Victoria Nuland" or "Victoria" or "Nuland"
- "Geoffrey Pyatt" or "Geoffrey" or "Pyatt"
- "Viktor Shokin" or "Viktor" or "Shokin"
- "Rosemont Seneca" or "Rosemont" or "Seneca"
- "Burnham Financial Group" or "Burnham"
- Eudora
- "Perkins Coie" or "Coie"
- "Fusion GPS" or "Fusion"
- Georgetown
- "Center for National Policy" or "CNP"

- "Truman Project" or "Truman"
- Kevin Morris
- "Marc Elias" or "Elias" or "Marc"
- "Marie Yovanovich" or "Marie" or "Yovanovich"
- Steele
- Mueller
- Weissmann
- "George Kent" or Kent
- Clinton
- "Yuriy Lutsenko" or "Yuriy" or "Lustensko"
- "Blue Star Strategies" or "Blue Star"
- "Karen Tramontono" or "Karen" or "Tramontono"
- "Sally Painter" or "Sally" or "Painter"
- "Eric Schwerin" or "Schwerin"
- "John Sandweg" or "Sandweg"
- "Etienne Bodard" or "Etienne" or "Bodard"
- "John Buretta" or "John" or "Buretta"
- "Tony Blinken" or "Anthony Blinken" or "Tony" or "Anthony" or "Blinken" or "TB.
- JRB
- HRB
- HB
- BHR
- HRC
- RSP
- Bohai
- Owasco
- Secretary
- "Café Milano" or "Milano"
- "Mark Zuckerberg" or "Zuckerberg" or "Zuck"
- Katie Dodge
- Air Force Two
- "big guy"
- "Rhbdc"
- "Kathy Chung" or "KC" or "Chung"
- KChung
- Dad

- "loan repayment" or "loan"
- "Americore Health" or "Americore"
- CEFC
- "Northern International Capital" or "NIC"
- "Hudson West III" or "Hudson" or "Hud"
- "Lion Hall" or "Lion"
- "Biden Foundation"
- "SAR" or "Suspicious Activity Report"
- Thonsdale
- Any emails with a ".gov" domain.
- Any emails with a "@beaubidenfoundation.com" domain
- Any emails with a "@rosemontseneca.com" domain
- Any emails with a "@rspdc.com" domain
- Any emails with a "@rosemontcapital.com" domain
- Any emails with a "@rstp.com" domain
- Any emails with a "@senecaga.com" domain
- Any emails with a "@burisma.com" domain
- Any emails with a "@bluestarstrategies.com" domain
- Any emails with a "@eudoraglobal.org" domain
- Any emails with a "@dodsondiversified.com" domain
- Any emails with a "@lionhallgp.com" domain
- Rhbdc1@gmail.com
- 67stingray@gmx.com
- jimbiden@icloud.com
- Auks@att.blackberry.net
- Champ4@att.blackberry.net
- Kchung@vpbiden.org
- Dodgekatie13@gmail.com
- Droidhunter88@gmail.com
- kathleenbiden@mac.com
- rhbdc@icloud.com
- rhb@rspdc.com
- 261penn@gmail.com
- Anthony_J_Blinken@ovp.eop.gov
- V.Pozharskyi.ukraine@gmail.com
- ablinken@aol.com
- hbiden@obblaw.com

- hbiden@rosemontseneca.com
- hbiden@senecaga.com
- rhbdc@me.com
- jimbiden@icloud.com
- sbiden@lionhallgp.com
- jbiden@lionhallgp.com

NARA has represented that it is processing documents potentially responsive to the now narrowed Request, including having sent initial tranches of responsive non-exempt documents to President Biden for his 60-day review under the Presidential Records Act (PRA). Applying the proposed search terms, NARA now estimates that there are approximately 3,000 hits, down from approximately 5,125 hits for the original Request, and that the potentially responsive documents average approximately six pages in length, for a total of approximately 18,000 responsive pages rather than 82,000. Plaintiff's concession results in a reduction of 78%.

## 2. NARA's rate of processing and production of documents.

NARA has not yet produced any documents to Plaintiff. As mentioned above, NARA has represented that it is processing documents potentially responsive to the Request, at a rate of 500 pages per month (PPM), and that it has sent an unspecified number of documents to President Biden for his PRA review.

As a result of the parties' discussions, NARA has proposed to increase its processing rate by only 100 PPM, from 500 PPM to 600 PPM. The rate of production will vary, depending on how many documents are responsive, non-exempt, and as to which the PRA requirements have been completed in each month. This would

result in processing (not production) being completed in approximately 2.5 years (rather than three years at 500 PPM). NARA has agreed to process first the documents with search terms of more interest to Plaintiff.

Plaintiff submits that the 500 PPM rate of production initially proposed by NARA is unreasonable in light of (a) NARA's failure to process *any* responsive documents until nearly 18 months after receipt of the Request, (b) the volume of documents to be processed and produced, and (c) the urgency of promptly presenting the public with records that are directly relevant to the integrity of the sitting President (and candidate for re-election in 2024)—records that have already generated extensive public interest. The 500 PPM rate of production would be a violation of FOIA's mandate that NARA make responsive records "promptly available." 5 U.S.C. § 552 (a)(3)(A).

NARA's proposed increase of processing by only 100 PPM is likewise unreasonable; such an incremental increase will do very little to eliminate unreasonable delay or to result in prompt availability of the documents. At 600 PPM, the time for processing to be completed shrinks by only six months, from three years to 2.5 years. Plaintiff believes the processing rate should be 1000 PPM. Though this is not the time for briefing the parties' disagreement on this issue, 1000 PPM is well below what courts have required of NARA and other federal agencies in similar

situations but still results in completion of processing in a reasonable 18 months (on top of an 18-month delay to date).

NARA proposes to provide a *Vaughn* index of processed documents only after processing and production is completed and NARA files a summary judgment motion. NARA maintains that providing any *Vaughn* index earlier than that would necessarily extend its estimate of the time to complete processing of potentially responsive documents. Plaintiff proposes that NARA provide *Vaughn* indexes on some periodic basis during processing. Plaintiff maintains that otherwise, NARA will be able to withhold potentially critical documents without notice or explanation until (under NARA's proposed rate of processing) 2.5 years from now and only then will Plaintiff be able to challenge the withholdings and redactions, with any supplemental production occurring later still.

### 3. Proposals for next steps in the case.

Plaintiff requests that the Court hold a scheduling conference as soon as possible to establish a briefing schedule. Plaintiff refrains from making arguments at this time as it understands that this would exceed the scope of this Court's October 30, 2023, Scheduling Order. Plaintiff's positions on the timing of *Vaughn* indexes and the rate of production are reasonable and legally supported. Plaintiff requests the opportunity to brief issues surrounding NARA's violation of FOIA, including the rate of production and the timing of a *Vaughn* index in a more appropriate setting

under a court-ordered briefing schedule. Plaintiff will also then have the opportunity to respond to the Declaration of Elizabeth Fidler, which was not provided to Plaintiff until 5:51 pm (ET) on December 8, 2023.

### DEFENDANT'S REPORT

The next step in this case is for NARA to process potentially responsive documents and produce non-exempt portions of any responsive documents to Plaintiff. The parties disagree on the appropriate processing rate and whether NARA should be required to produce *Vaughn* indexes with its document productions, ahead of summary judgment. The Court may enter a FOIA-specific case management order that resolves these issues now. NARA is not opposed to holding a status conference before entry of an order. However, the Court need not set a briefing schedule on "NARA's violation of FOIA" based on the processing rate and the production of a *Vaughn* index: these are matters of case procedure, not merits questions concerning NARA's searches or productions.[1]

The Court should enter an order permitting NARA to process at a rate of 600 pages per month. This processing rate is higher than what courts typically authorize. It is increased from NARA's initial processing rate of 500 pages per month at the

---

[1] Plaintiff declines to present any legal argument in support of its position, but it is standard practice in FOIA litigation for parties to present their disputes before the Court in a JSR, which disputes may be discussed further in a status conference. Additionally, Plaintiff has been well aware of Defendant's position and legal arguments, which it has stated during the parties' negotiations.

outset of the litigation.  And it is the maximum rate NARA can maintain while also responding to an increase in requests from numerous third parties, including other FOIA requesters ahead of Plaintiff, Congress, and Special Counsels. Ordering a higher processing rate would place significant burdens on NARA, forcing it to reallocate its limited resources to effectively prioritize Plaintiff over and above these third parties—for no reason other than Plaintiff's subjective interest in receiving the documents it requested earlier (an interest shared by all requesters).  NARA has offered to discuss processing priorities if Plaintiff would like to receive certain categories of documents earlier, and NARA is able to refine its searches if Plaintiff is willing to narrow its request further.  In the meantime, the Court should deny Plaintiff's request to skip ahead of others in the processing queue, simply because it seeks documents responsive to its own request on an arbitrarily rushed schedule.

The Court should also decline Plaintiff's novel request for piecemeal production of *Vaughn* indexes—an extremely time-consuming document to compile—along with NARA's production of any responsive, non-exempt documents.  Preparing seriatim *Vaughn* indexes would serve no litigation purpose; but it would substantially interfere with NARA's efforts to process documents. NARA could not maintain a processing rate of 600 pages per month (or even 500 per month) if it were required to compile a *Vaughn* index with its productions. Contrary to Plaintiff's argument, it is standard practice in FOIA cases for plaintiffs

to challenge all withholdings after production is complete, and to receive the agency's explanation of the withheld information at that time.

Accordingly, the Court should enter a FOIA-specific case management order that orders NARA to continue processing, at a rate of 600 pages per month, documents potentially responsive to Plaintiff's FOIA request and does not impose a novel piecemeal *Vaughn* index requirement. The Court may also order the parties to submit periodic status reports advising the Court on the status of NARA's response while processing is ongoing. And it may direct the parties to meet and confer after NARA completes its response in order to discuss any disputes over the response and determine a schedule for summary judgment briefing, if appropriate. Such orders are routine in the District of Columbia, where the vast majority of FOIA cases are litigated. Defendant proposes an order following its position below.

To provide relevant context for this case and Defendant's position, Defendant first explains standard FOIA litigation procedures, the status of its FOIA response, and the unique review procedures applicable to Plaintiff's request for vice-presidential records. Defendant then explains its position on the matters in dispute and proposes an order.

## BACKGROUND ON FOIA AND THE PRESIDENTIAL RECORDS ACT

## I.   Standard FOIA Litigation Procedures

On August 28, 2023, Plaintiff brought this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking vice-presidential records—specifically, copies from three specified email addresses during the time that President Joe Biden was Vice President.  Compl. Ex. 1, ECF No. 1-1.  On September 29, 2023, Defendant answered the Complaint, ECF No. 8, and on October 30, 2023, the parties submitted a Joint Preliminary Report and Discovery Plan, where they proposed that they submit a further status report on December 8, 2023, updating the Court on the parties' discussions over a narrowed FOIA request, NARA's rate of processing, and next steps in the litigation.  ECF No. 11, at 10.  The Court adopted the parties' proposal.  ECF No. 11.

NARA is currently processing all potentially responsive records for the purpose of producing non-exempt portions of any responsive records, which is the first step in any FOIA case.[2]  After the agency completes its response, the case may become moot (if the plaintiff does not challenge the response or does not seek attorneys' fees), *see Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982), or the case may be decided on summary judgment (if the plaintiff raises challenges), *Miscavige*, 2 F.3d at 369.  If Plaintiff challenges NARA's response, the agency has the burden of showing at summary judgment that its search was adequate and that any withheld

---

[2] As noted in the parties' Preliminary Report, discovery is generally inappropriate in FOIA litigation.  *See Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993); *Schiller v. INS*, 205 F. Supp. 2d 648, 653 (W.D. Tex. 2002).

portions of documents are exempt from production.  *See Karanstalis v. U.S. Dep't of Justice*, 635 F.3d 497, 500 (11th Cir. 2011).  It may do so by submitting supporting declarations, *id.*, or by relying on what is commonly referred to as a "*Vaughn* index," *Miscavige*, 2 F.3d at 369.  Whether in a declaration or index form, the document accompanying the summary judgment motion must describe the withheld information with enough detail to demonstrate that any claimed exemptions apply, without giving away what the agency is trying to protect. *See Natural Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1109 (C.D. Cal. 2005).

Given the unique nature of FOIA proceedings, it is common practice for courts to enter FOIA-specific case management orders in lieu of the typical civil case management orders under Rules 16(b) or 26(f) orders, *see* DDC LCvR 16.3(b) (exempting FOIA cases from the requirements of Rules 16(b) and 26(f)).  These orders generally require parties to periodically update the court on the status of the agency's response and, when the agency's response is complete, to propose a schedule for summary judgment briefing, if appropriate.  *See, e.g.*, *Jordan v. Dep't of Justice*, No. 17-cv-2702 (D.D.C. Aug. 28, 2018) (ordering that documents be processed at a rate of 300 pages per month and the submission of a joint status report every 90 days during processing phase).  The orders may also require or permit the agency to process documents at a particular rate.

II.    **The Status of NARA's Response and the Procedural Requirements of the Presidential Records Act**

NARA had been processing documents potentially responsive to Plaintiff's original FOIA request at a rate of 500 pages per month.  After Plaintiff narrowed its request, NARA began processing documents at a rate of 600 pages per month.  *See* Fidler Decl. ¶ 15.

Importantly, the vice-presidential records sought here are subject to the Presidential Records Act (PRA), 44 U.S.C. § 2201-2209, which imposes certain procedural requirements before the records can be produced to Plaintiff.  *See id.* § 2208; 36 C.F.R. § 1270.46.   Under the PRA, before NARA releases presidential records to the public, the Archivist must first notify the incumbent President and the President who was in office when the records were created.   44 U.S.C. § 2208(a)(1)(A).   Whenever the Archivist intends to release vice-presidential records, the Archivist must also notify the Vice President who was in office at the time the records were created.  *See id.* § 2207 (extending the notice requirements to Vice Presidential records).  These notified parties then have 60 working days— which may be extended once, for an additional 30 working days—to review the records before their release and assert any claim of constitutionally-based privilege against disclosure.  44 U.S.C. §§ 2208(a)(3)(A), (B).

Accordingly, NARA may release any non-exempt portions of records responsive to Plaintiff's request only after the 60- to 90-working-day PRA

notification process is complete.  Because NARA needs a brief period of time to prepare the documents for production after expiration of the notification period, NARA expects to be able to make productions either 70 working days, or (if the former or incumbent President, or former Vice President, invokes the 30 working-day extension) 100 working days, after each notification.[3]  NARA intends to make the required PRA notification for the batch of documents processed each month by the last day of the month.[4]  NARA has already made two PRA notifications regarding the release of documents responsive to Plaintiff's original (not narrowed) FOIA request, the first at the end of October and the second at the end of November. Fidler Decl. ¶ 12.

## DEFENDANT'S POSITION

**I.    The Court Should Authorize NARA's 600 Page-Per-Month Processing Rate and Decline to Order Early, Piecemeal Production of a *Vaughn* Index.**

    **A. NARA's is Processing Potentially Responsive Documents at its Maximum Capacity.**

"Courts have broad discretion to determine a reasonable processing rate for a FOIA request." *Colbert v. FBI*, No. 16-cv-1790, 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018).   Factors informing the determination include "the size and

---

[3] If the end of the 70- to 100-working-day period falls on a weekend of holiday, NARA would produce the records the next working day.
[4] If the last day of the month falls on a weekend or a holiday, NARA would make the PRA notification on the following working day.

compelling need of the request compared to others, as well as the effect of the request on the [agency's] ability to review other FOIA requests." *Id.* Courts "often give deference to the agency's release policies," *id.*, and they afford non-conclusory and detailed agency affidavits and declarations "a presumption of good faith, which cannot be rebutted by purely speculative claims[.]" *Jud. Watch, Inc. v. U.S. Dep't of Com.*, No. 17-cv-1283, 2020 WL 6939807, at *2 (D.D.C. Nov. 25, 2020) (citation omitted).

NARA,'s current processing rate of 600 pages per month is considerably higher than its standard rate of 250 pages per month, Fidler Decl. ¶ 24, and is already increased from NARA's initial, 500 page-per-month rate at the outset of this case. The attached declaration from Ms. Elizabeth Fidler, the Acting Director of the Archival Operations Division ("the Division") handling Plaintiff's request, explains that processing Plaintiff's request at an even higher rate "would have a significant adverse impact on [the Division] and on other requesters." *Id.* ¶ 25. Specifically, the Division "would be unable to address its oldest pending FOIA requests received in 2016 and 2017, to meet timeliness standards for responding to written requests from the public, and to fully engage in agency-wide initiatives and priorities." *Id.*

Notably, the Division "has only three archivists available for processing records in response to FOIA and other access requests," each of whom "can spend no more than 70 percent of their work time responding to access requests" while also

managing "competing work obligations."  *Id.* ¶ 18.   Together, the archivists must

divide their time among a "backlog of FOIA and other access requests, four monthly

litigation processing schedules, two document requests from the House Oversight

Committee, and Special Counsel subpoenas seeking a large volume of records."  *Id.*

¶ 19.   Moreover, there is "overlap across the records responsive to some of" these

pending requests, which requires reviewers to spend additional time taking "detailed

and painstaking notes to facilitate the [PRA] notification process[.]"  *Id.* ¶ 21.

The volume of pending requests is substantial. "The Division currently has

126 pending FOIA requests" for vice-presidential records alone, which collectively

add up to a processing backlog of nearly 750,000 files.  *Id.* ¶ 22.   Altogether, those

files comprise approximately 4 million pages and nearly 40,000 photographs and

audiovisual tapes from vice-presidential records.  *Id.*   On top of that backlog, the

Division is "handling a backlog of mandatory declassification requests and FOIA

requests for classified Presidential records in its physical custody."  *Id.*   NARA

expects to receive 40 more FOIA and access requests in fiscal year 2024.  *Id.* ¶ 23.

NARA cannot process Plaintiff's request at a rate beyond 600 pages per month

while continuing to equitably and responsibly manage this already existing caseload.

Courts have recognized the "explosion of FOIA requests and subsequent litigation"

in recent years that "has created a substantial workload for agencies."  *Chaverra*,

2020 WL 7419670, at *1.  Thus, the agency's ability to process all pending FOIA

requests carries substantial weight in determining the appropriate processing rate in any given FOIA case. *See id.*; *cf. Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 47 (D.D.C. 2014) (denying preliminary injunction requesting immediate production, where allowing FOIA plaintiff "to jump ahead of the line would upset the agency's processes and be detrimental to the other expedited requesters"). In considering that factor, courts have routinely approved processing rates even lower than the 600-page NARA has adopted here. The D.C. Circuit, for instance, has found a 500 page-per-month rate appropriate when it "serve[d] to promote efficient responses to a larger number of requesters" and "avoid[] situations in which a few, large queue requests monopolize finite processing resources." *Nat'l Sec. Couns. v. U.S. Dep't of Just.*, 848 F.3d 467, 471-72 (D.C. Cir. 2017); *see also Chaverra*, 2020 WL 7419670, at *1 (noting that "[w]hile all requesters are eager to jump to the front of the queue," courts "have approved production schedules" involving a 500 page per month rate). Indeed, 500 pages per month is generally standard,[5] and it is a rate that parties often agree to.[6] But courts often permit much

---

[5] *See Middle E. F. v. U.S. Dep't of Homeland Sec.*, 297 F. Supp. 3d 183, 185-87 & n.3 (D.D.C. 2018) (approving agency's 500-page-per-month processing rate over plaintiff's urging that a doubled rate was necessary to avoid production delays, and collecting similar cases); *White v. Exec. Off. of US Att'ys*, 444 F. Supp. 3d 930, 943-44 (S.D. Ill. 2020) (similar), *aff'd sub nom. White v. Fed. Bureau of Investigation*, 851 F. App'x 624 (7th Cir. 2021); *Color of Change v. U.S. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 451 (S.D.N.Y. 2018) (noting the court's earlier order requiring the agency to process or produce 500 pages per month).

[6] *See, e.g., id.*; *see also Am. First Policy Inst. v. U.S. Dep't of Health and Hum. Servs.*, Case No. 4:23-cv-369 (N.D. Tex.), ECF No. 15 (scheduling order adopting 500-page-per-month rate proposed by the parties in ECF No. 14); *Citizens United v. U.S. Dep't of State*, Case No. 15-cv-

lower processing rates than that.  *See, e.g.*, *Ctr. for Repro. Rights v. Dep't of State*, No. 18-2217 (D.D.C. Apr. 3, 2019) (directing a 300-page-per-month processing rate, despite the plaintiff's request for a higher rate, in a case where there are over 123,000 potentially responsive pages); *Citizens United v. U.S. Dep't of State*, No. 16-cv-67 (D.D.C.), ECF No. 17 at 3 (declining "to adopt Plaintiff's proposed production order of 2000 pages per month" and instead holding State "to its 300-page commitment").

During the parties' negotiations, Plaintiff's only objection to NARA's proposed processing rate was the length of time it will take for NARA to respond to its FOIA request.  Yet courts frequently accept a 500 page-per-month processing rate even when it means that it may take the agency "multiple years," even "*decades*," "to produce responsive records."  *Ctr. for Immigr. Studies v. U.S. Citizenship & Immigr. Servs.*, 628 F. Supp. 3d 266, 273 (D.D.C. 2022) (emphasis added) (citing examples); *Negley v. U.S. Dep't of Just.*, 305 F. Supp. 3d 36, 46 (D.D.C. 2018) (permitting 500 page-per-month processing rate even though it would take more than 80 years to produce all the records at issue); *Freedom Watch v. Bureau of Land Mgmt.*, 325 F. Supp. 3d 139, 142 (D.D.C. 2018) (upholding 500-page-per-month rate even though it would take 500 months to process records); *White*, 444 F. Supp. 3d at 942 (similar, in case involving nine year processing and

1720 (D.D.C.), Minute Ord. of June 28, 2016 (adopting rate of 500 pages every four weeks from ECF No. 11 ¶ 10).

production time); *Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*, 316 F. Supp. 3d 1, 3 (D.D.C. 2018) (noting that processing over 8,000 documents took approximately 3.5 years).   Here it should take only 2.5 years to process documents potentially responsive to Plaintiff's narrowed FOIA request.

Plaintiff now states that the documents should be processed more quickly because the records it seeks have generated public interest.  Plaintiff made a cursory request for expedited processing on a similar basis at the administrative stage, but NARA denied the request, and Plaintiff has not sought review of that denial in this litigation.  *See* Fidler Decl. ¶¶ 9-10.

Just as other courts have, this Court should deny Plaintiff's request for a substantially increased processing rate, which would prejudice other FOIA requesters "whose requests were filed long before Plaintiff's," Fidler Decl. ¶ 25, as well as requests from Congress and the Special Counsel—simply because Plaintiff wishes to receive *its* response more quickly.  The Court should instead allow NARA to process documents at a rate of no more than 600 pages per month.

### B. Producing piecemeal *Vaughn* indexes would serve no litigation purpose but would interfere with NARA's document processing.

During the parties' negotiations, Plaintiffs stated that it sought the "rolling" production of *Vaughn* indexes with each one of NARA's document productions.  In its position above, Plaintiff now maintains that it seeks *Vaughn* indexes "on some periodic basis during processing." *Infra* p.8.  Either way, Plaintiffs' unusual request

for early, "rolling" *Vaughn* indexes is legally unsupported and contrary to the litigation purposes served by the index.

It is well established that "[t]he requirement for detailed declarations and *Vaughn* indices is imposed *in connection with a motion for summary judgment* filed by a defendant in a civil action pending in court." *See*, *e.g.*, *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 142, 147 (D.D.C. 2000) (footnote omitted) (emphasis added). That is because the central purpose of the index is to facilitate *judicial review* of challenged withholdings. *See Citizens for Resp. & Ethics in Wash. v. FEC*, 711 F.3d 180, 187 n.5 (D.C. Cir. 2013). The index "allow[s] the court to determine if the exemptions are validly asserted without having to physically inspect each of the documents" and "gives the opposing party some basis on which to oppose the motion" for summary judgment. *Pub. Citizen*, 997 F. Supp. at 61. Indeed, a *Vaughn* index is not necessarily "appropriate in all FOIA cases," *Minier v. CIA*, 88 F.3d 796, 804 (9th Cir. 1996)—"[t]he filing of a dispositive motion, along with detailed affidavits, may obviate the need for indexing the withheld documents," *Stimac v. U.S. Dep't of Just.*, 620 F. Supp. 212, 213 (D.D.C. 1985); *see also Se. Legal Found., Inc. v. United States Env't Prot. Div.*, 181 F. Supp. 3d 1063, 1074 (N.D. Ga. 2016) (citing D.C. and Eleventh Circuit cases finding that agency affidavits may be adequate without the need for indexing).

Courts therefore routinely deny motions to compel the production of a *Vaughn*
index before "processing is complete" and ahead of dispositive briefing.  *Cohen v.*
*FBI*, 831 F. Supp. 850, 855 (S.D. Fla. 1993); *Stimac*, 620 F. Supp. at 213 (denying
a plaintiff's motion to compel preparation of a *Vaughn* index "before the filing of
dispositive motions" as "premature"); *see also Miscavige*, 2 F.3d at 369; *Watkins*
*Motor Lines, Inc. v. U.S. Equal Emp. Opportunity Comm'n*, No. 8:05-cv-1065, 2005
WL 8160384, at *3 (M.D. Fla. Nov. 29, 2005); *Ioane v. C.I.R.*, No. 3:09-CV-00243-
RCJRAM, 2010 WL 2600689, at *6 (D. Nev. Mar. 11, 2010); *Pinson v. U.S. Dep't*
*of Justice*, 975 F. Supp. 2d 20, 32 (D.D.C. 2013); *Gerstein v. CIA*, No. 06-4643,
2006 WL 3462659, at *5 (N.D. Cal. Nov. 29, 2006).

While agencies sometimes agree to provide a draft *Vaughn* index to the
requester ahead of summary judgment briefing,[7] they do so only after productions
are complete, for the purpose of narrowing the disputed merits issues.  Plaintiff
provides no basis for imposing an earlier, piecemeal *Vaughn* index requirement
here—particularly where the information NARA already provides with all FOIA
productions may provide Plaintiff with much of what it seeks through the more
onerous *Vaughn* index.  Specifically, for every redaction or withheld document,

---

[7] *See, e.g.*, *Se. Legal Found.*, 181 F. Supp. 3d at 1075 ("During the litigation, SLF and EPA agreed
that EPA would prepare a sample *Vaughn* index detailing the basis for the asserted FOIA
Exemptions *for use in conjunction with the parties' summary judgment motions* on SLF's
December 2009 FOIA Request." (emphasis added)).

NARA provides the applicable exemption by noting it in a text box on top of the redaction itself or by including an accompanying "withdrawal sheet" that may contain a brief document description and metadata as appropriate, depending on the exemption claimed.  Fidler Decl. ¶ 27.  Moreover, unredacted portions of redacted documents may provide context clues about what has been withheld.

Additionally, Plaintiff's demand for a rolling *Vaughn* index is at odds with its demand for a significantly increased processing rate.  Courts recognize that "[p]roducing a properly detailed *Vaughn* Index is a 'considerable burden.'"  *Natural Res. Def. Council*, 388 F. Supp. 2d at 1109 (quoting *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 271 (D.D.C. 2004)).  Here, as is often the case, the same people processing the records relating to Plaintiff's request would also be preparing any *Vaughn* index.  Producing a detailed *Vaughn* index—whether every month, as Plaintiff sought in negotiations, or "on some periodic basis during productions" as Plaintiff more vaguely seeks now—would substantially interfere with the archivists' ability to process documents at any rate, whether 500 pages per month, 600, or greater.  Plaintiff's unusual and unsupported request for piecemeal *Vaughn* indexes thus undermines its interest in receiving non-exempt responsive records at a faster pace and only serves to disrupt, not further, the litigation.  The Court should deny it.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|                                              |     |                            |
| -------------------------------------------- | --- | -------------------------- |
|                                              | )   |                            |
| SOUTHEASTERN LEGAL                           | )   |                            |
| FOUNDATION, INC.,                            | )   |                            |
|                                              | )   |                            |
| Plaintiff,                                   | )   | Case No. 1:23-cv-03819-LMM |
|                                              | )   |                            |
| v.                                           | )   |                            |
|                                              | )   |                            |
| NATIONAL ARCHIVES AND                        | )   |                            |
| RECORDS ADMINISTRATION,                      | )   |                            |
|                                              | )   |                            |
| Defendant.                                   | )   |                            |

## **[PLAINTIFF'S PROPOSED] SCHEDULING ORDER**

Upon review of the information contained in the Joint Scheduling Report, the

Court orders that on, _____, the parties shall appear for a status conference [at the

following location: _____/via Zoom.]

IT IS SO ORDERED, this the _____ day of 2023.


_____
LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SOUTHEASTERN LEGAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | FILE NO. 1:23-cv-03819-LLM |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) ) ) | |
| Defendant. | ) ) | |

## [DEFENDANT'S PROPOSED] ORDER

It is hereby **ORDERED** that:

1.    The National Archives and Records Administration (NARA) shall process documents potentially responsive to Plaintiff's FOIA request at a rate of approximately 600 pages per month.

2.    The parties shall submit a Joint Status Report apprising the Court on the status of this case by March 7, 2024, and every 90 days thereafter.

3.    After NARA completes productions of exempt portions of any responsive documents, the parties shall meet and confer about any disputes over NARA's response and submit a further status report to the Court proposing a briefing schedule for summary judgment if any such disputes are not resolved.  The parties

shall submit the latter status report according to the typical 90-day schedule, or within 60 days of NARA's final response, whichever is earlier.

IT IS SO ORDERED, this ___ day of _____, 2023.

_____
LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

Dated:  December 8, 2023   Respectfully submitted,

           BRIAN M. BOYNTON
           Principal Deputy Assistant Attorney General

           MARCIA BERMAN
           Assistant Branch Director

           */s/ Kyla M. Snow*
           KYLA M. SNOW
           Ohio Bar No. 96662
           Trial Attorney
           U.S. Department of Justice, Civil Division
           Federal Programs Branch
           1100 L Street, NW
           Washington, D.C.  20005
           Email: kyla.snow@usdoj.gov
           Phone: (202) 514-3259
           Fax: (202) 616-8460

           *Counsel for Defendant*