IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SOUTHEASTERN LEGAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) ) | FILE NO. 1:23-cv-03819-LLM |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
JOINT STATUS REPORT POSITION**

Defendant National Archives and Records Administration (NARA) provides the following response in opposition to Plaintiff Southeastern Legal Foundation's (SLF) request to compel NARA to process documents at a rate of at least 1,000 pages per month and produce *Vaughn* indexes with productions, *see* Pl.'s Br., ECF No. 14.

**INTRODUCTION**

Plaintiff's dual, and shifting, demands that NARA process documents at a rate of "at least 1,000" pages per month ("ppm"), Pl.'s Br. 3, ECF No. 1, while preparing "interim *Vaughn* indexes" to produce "with any production or on some periodic basis," *id.* at 3, 21, would impose unreasonable burdens on NARA for no litigation purpose. The Court should deny both requests.

First, NARA's current processing rate of 600 ppm—which already far exceeds the standard rate of 250 and has been increased from 500 since the start of the litigation—is the maximum rate NARA can maintain while responsibly and equitably managing its caseload, without undermining responses to high priority requests from Congress and Special Counsel subpoenas and FOIA requesters ahead of Plaintiff. Based on these types of concerns, and mindful of "the explosion of FOIA requests and subsequent litigation" in recent years, courts frequently approve processing rates well below 600 ppm. *Chaverra v. U.S Immigr. & Customs Enf't*, No. 18cv289, 2020 WL 7419670, at *1 (D.D.C. Nov. 5, 2020). Plaintiff argues that the public has an interest in receiving the records at a faster rate, but Plaintiff's delay in seeking records that are over eight years old, through a June 2022 FOIA request and October 2023 Complaint that fail to allege any need for expedited processing, contradicts that assertion. Moreover, NARA has offered to prioritize the processing of categories of documents that may be of greater interest to Plaintiff, but Plaintiff has not responded to that offer. Under these circumstances, imposing heavy burdens on NARA to process Plaintiff's request on an expedited schedule, to the detriment of other requesters and Special Counsel investigations, would be unreasonable.

Second, Plaintiff's unusual demand for production of partial *Vaughn* indexes at some unspecified rate during the course of production would not further the resolution of any dispositive issue but would only impose more burdens on the staff

processing Plaintiff's request.    Plaintiff asserts that courts frequently order production of a *Vaughn* index before an agency moves for summary judgment, but Plaintiff does not simply seek an index before summary judgment briefing—Plaintiff seeks piecemeal production of an index beginning with NARA's initial productions and all throughout the production period.  None of the cases on which Plaintiff relies has ordered such relief, and the Court should decline to do so here.  Whether Plaintiff should receive a *Vaughn* index before NARA moves for summary judgment may be decided, if necessary, at the appropriate time after NARA completes its FOIA response.  NARA may produce an index at that time, if doing so would further resolution of issues, which may obviate any need for Court intervention.

For the reasons below, and as stated in Defendant's position in the parties' Joint Status Report (JSR), ECF No. 12, the Court should allow NARA to continue processing documents at a rate of 600 ppm, without the added burden of producing a *Vaughn* index piecemeal.

## BACKGROUND

### I.    Plaintiff's FOIA Request and the Status of NARA's Response

On June 9, 2022, Plaintiff submitted a FOIA request to NARA seeking "copies of all emails President Joe Biden preserved through [NARA] from his time as vice president for" three specified email addresses and "any correspondence between Joe Biden and/or his legal or government representatives concerning the use of these

emails." Compl. Ex. 1 ("FOIA Request"), ECF No. 1-1. The request included a one-paragraph argument for expedited processing that appeared to be copied and pasted from an unrelated request to the State Department. *See* FOIA Request at 4; *see also* Decl. of Elizabeth Fidler ¶ 9 ("2d Fidler Decl.") (attached as Ex. 1).

On June 22, 2022, NARA notified Plaintiff that its request had been transferred to the Archival Operations Division (AOD). Compl. Ex. 2, ECF No. 1-2. Two days later, AOD informed Plaintiff that it had performed a search for "Vice Presidential records related to [Plaintiff's] request," and that it had located more than 5,000 "potentially responsive records," but that it was "currently processing and reviewing FOIA requests that precede[d] [Plaintiff's] request." Compl. Ex. 4, at p.1, ECF No. 1-4. "To treat everyone equitably," AOD explained, it had "placed [Plaintiff's] request in [AOD's] Complex queue by the date it was received in [AOD's] office." *Id.* In another letter issued the same day, AOD also informed Plaintiff that it had denied Plaintiff's request for expedited processing because the request did not meet the requirements defined by NARA's regulations. *See* Compl. Ex. 3, at 1, ECF No. 1-3. Plaintiff did not administratively appeal. On August 28, 2023, Plaintiff brought this action. *See* Compl.

NARA is currently processing all potentially responsive documents for the purpose of producing to Plaintiff any non-exempt portions of responsive records. The parties have been discussing the scope of Plaintiff's request and the status of

NARA's processing since early in the case.  During the parties' initial discussions in October 2023, and based on limited review of a small number of emails, NARA estimated that the potentially responsive records averaged 16 pages each, thus totaling around 82,000 pages.  2d Fidler Decl. ¶ 13.  NARA also informed Plaintiff that it was processing the documents at a rate of 500 ppm.  *Id.* ¶ 12.

The parties began discussing ways of reducing the volume of documents in order to complete the response to Plaintiff's FOIA request more expeditiously.  On November 20, Plaintiff proposed narrowing its FOIA request from all emails in the three specified accounts to emails in those accounts containing certain words. Specifically, Plaintiff proposed 221 search terms with "or" connectors and no limiting date.  *See* JSR 2-6 (listing the search terms).  NARA ran a new search using those search terms, which resulted in around 3,000 hits.  2d Fidler Decl. ¶ 14.  While NARA was running the new search, it reviewed a larger tranche of documents to calculate a more accurate average per-document page count.  *Id.* ¶ 15.  On December 5, NARA notified Plaintiff that it now estimated that the average length of documents was 6, rather than 16, pages each.  *See* Email from Kyla Snow to Braden Boucek (Nov. 22, 2023) (attached as Ex. 2).  That meant that there was expected to be roughly 32,000 pages of records potentially responsive to the initial request (*i.e.*, without the search terms applied) and roughly 18,000 pages of records potentially

responsive to the narrowed request. *Id.*; *see also* 2d Fidler Decl. ¶ 15.[1]  In other words, the application of Plaintiff's search terms reduced the total number of pages by an estimated 14,000.

While the parties were discussing the addition of search terms, Plaintiff also demanded that NARA double its processing rate from 500 to 1,000 ppm and provide a *Vaughn* index with every document production.  NARA could not agree to the burdensome request to produce a *Vaughn* index with every production.  However, NARA reviewed its processing capacity and, in an effort to accommodate Plaintiff's interest in receiving any non-exempt responsive documents more quickly, stated that it would increase its processing rate to 600 ppm.  2d Fidler Decl. ¶ 16.  At that rate it should take NARA only 2.5 years to process potentially responsive documents.[2]  NARA also invited Plaintiff to propose processing priorities so that NARA could focus on first processing documents Plaintiff is most interested in receiving, but Plaintiff declined to do so.  *Id.* ¶¶ 44-45.

NARA has now processed several batches of documents during its review in

---

[1] Despite Plaintiff's contrary assertion, it was not the application of 221 search terms that reduced each document's average number of pages from 16 to 6, *see* Pl.'s Br. 4, but instead NARA's more accurate calculated average page count, *see* 2d Fidler Decl. ¶¶ 13-15.

[2] Due to the high volume of potentially responsive records in this matter, NARA is unable to calculate a precise page count of the potentially responsive records and can only rely on estimates, but its experience thus far confirms the accuracy of the current 6-page estimated average.

October, November, and December. *Id.* ¶ 17. NARA expects to make its first release of responsive documents by early February 2024. *Id.* ¶ 19. NARA could not release the records any sooner because the Presidential Records Act (PRA) imposes additional procedural requirements that NARA must comply with before releasing any records to Plaintiff. Specifically, NARA must provide the incumbent President and the President and Vice President who were in office when the records were created with 60 working days—which may be extended once, for an additional 30 working days—to review and assert any claim of constitutionally-based privilege over the records before their release. *See* 44 U.S.C. §§ 2208(a)(1)(A), (a)(3)(A)-(B); *id.* § 2207; *see also* JSR 14-15. NARA has already made PRA notifications for documents reviewed in October, November, and December and expects to make the next PRA notification by January 31, 2024. 2d Fidler Decl. ¶ 17.[3]

## ARGUMENT

I.   **The Court Should Allow NARA to Continue Processing Potentially Responsive Documents at a Rate of 600 Pages Per Month.**

   **A. NARA's Processing Rate of 600 Pages Per Month is Reasonable.**

   The question before the Court is whether NARA's processing rate is

---

[3] Because NARA needs a brief period of time to prepare the documents for production after expiration of the notification period, NARA expects to be able to make productions either 70 working days, or (if the former or incumbent President, or former Vice President, invokes the 30 working-day extension) 100 working days, after each notification. If the end of the 70- to 100-working-day period falls on a weekend of holiday, NARA would produce the records the next business day.

reasonable under the circumstances of this case. *Harrington v. FDA*, 581 F. Supp. 3d 145, 149 (D.D.C. 2022) (T]he issue for the Court to decide is simple: is [the agency's] timeline for processing [the plaintiff's] FOIA requests reasonable?"). The question is not, as Plaintiff suggests, whether NARA has "violated" the FOIA by not producing documents within the default timelines set by the statute. *See* Pl.'s Br. 8. Answering that question would not bear on the appropriate processing rate but instead on whether Plaintiff is required to exhaust its administrative remedies before seeking relief in district court. *CREW v. Fed. Election Comm'n*, 711 F.3d 180, 189 (D.C. Cir. 2013) ("If the agency does not adhere to FOIA's explicit timelines, the 'penalty' is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court."). NARA has not raised an exhaustion defense in response to Plaintiff's suit. Thus, now that the Court has jurisdiction over the case, the question is how it should exercise its discretion in determining the appropriate processing rate. *See Harrington*, 581 F. Supp. 3d at 149.

"Courts have broad discretion to determine a reasonable processing rate for a FOIA request." *Colbert v. FBI*, No. 16-cv-1790, 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018) (collecting cases). While they "have exercised that discretion in somewhat different ways depending on the facts and posture of the case, they have largely coalesced around" certain factors, including "the size and compelling need of the request compared to others, as well as the effect of the request on the

[agency's] ability to review other FOIA requests." *Harrington*, 581 F. Supp. 3d at 150 (citations omitted).  Courts also consider the volume of requests before the agency, whether the volume has recently increased, agency resources, other FOIA litigation against the agency, the agency's standard release policies, "and how ordering swifter production would affect other FOIA requesters patiently waiting their turn." *Id.* (citing cases); *see also White v. Exec. Off. of US Att'ys*, 444 F. Supp. 3d 930, 943-44 (S.D. Ill. 2020), *aff'd sub nom. White v. FBI*, 851 F. App'x 624 (7th Cir. 2021) (considering strain on agency resources when determining reasonable rate).  In evaluating these factors, courts "often give deference to the agency's release policies," *Colbert*, 2018 WL 6299966, at *3, and afford non-conclusory and detailed agency affidavits and declarations "a presumption of good faith, which cannot be rebutted by purely speculative claims," *Jud. Watch, Inc. v. U.S. Dep't of Com.*, No. 17-cv-1283, 2020 WL 6939807, at *2 (D.D.C. Nov. 25, 2020) (citation omitted).

Applying those factors, the D.C. Circuit has found a 500-ppm rate appropriate when it "serve[d] to promote efficient responses to a larger number of requesters" and "avoid[] situations in which a few, large queue requests monopolize finite processing resources." *Nat'l Sec. Couns. v. DOJ*, 848 F.3d 467, 471-72 (D.C. Cir. 2017) (internal quotation marks and citation omitted).  Other courts have approved the same rate.  *See* JSR 18 n.5.  And courts often approve much lower processing rates, even in cases involving thousands of pages of documents that will take years

to process.  *Id.* at 19.  It is not unusual for agencies to take multiple years or even

decades to produce responsive records.  *See Ctr. for Immigr. Studies v. USCIS*, 628

F. Supp. 3d 266, 273 (D.D.C. 2022) (citing examples); *see also* JSR 17-20.

      NARA's 600-ppm processing rate is imminently reasonable considering the

circumstances of this case.  It is well above the agency's standard 250-ppm rate and

still above the 500-ppm rate NARA applied at the outset of the case.  2d Fidler Decl.

¶¶ 12, 34.  As explained in Defendant's JSR position, *see* JSR 16-17, increasing the

rate to at least 1,000 ppm would substantially interfere with NARA's ability to

respond to other pending requests—not only FOIA requests ahead of Plaintiff's

(some of which have been pending since 2016 and 2017) but also special access

requests, which include requests from Congress and Special Counsels.  *Id.* ¶¶ 20-36.

      The division handling Plaintiff's FOIA request, AOD, also handles FOIA

"requests for four Vice Presidential collections, including that of former Vice

President Joseph Biden."  *Id.* ¶ 20.  It is currently handling all requests for Vice

Presidential records from Congress and the Special Counsels. *Id.* ¶¶ 20-21.  Since

the fall of 2022, the volume of such requests has substantially increased.  *Id.*  While

AOD received only 23 FOIA requests in 2021—a typical number during preceding

years—the number of requests jumped to 109 in 2022 and stayed high at 84 in 2023.

*Id.* ¶ 29.  And while AOD received only 3 special access requests in 2021 and 2022,

it received 22 in 2023, half of which were high-volume requests.  *Id.* ¶ 28.  Eight of

those special access requests were subpoenas; NARA received zero subpoenas in 2021 and 2022. *Id.* Importantly, each of these requests may vary in scope, and a single request could be expansive and consist of multiple parts. *Id.* ¶ 31.

Responding to all of these requests has consumed 100 percent of AOD's resources since August 2022, such that AOD has been unable to process any FOIA requests in its complex queue—where Plaintiff's request was placed—that are not in litigation. *Id.* ¶ 23. The uptick in requests has created a backlog of FOIA requests for Vice Presidential records—which comprises nearly 750,000 files (approximately 4 million pages)—in addition to "a backlog of mandatory declassification requests and FOIA requests for classified Presidential records[.]" *Id.* ¶ 32.

All of this has placed considerable strain on AOD's resources, despite AOD's best efforts to increase its capacity to respond. In the fall of 2023, AOD hired two new archivists to help manage its workload, and therefore now has five archivists above to process records responsive to the backload of requests. *Id.* ¶¶ 24-25. However, it will take several more months' ramp-up time before the new archivists are fully trained on the complexities of the PRA. *Id.* The archivists' limited processing capacity is currently divided among "four monthly litigation processing schedules, a multi-part request from the House Oversight Committee, a special access request from the incumbent administration, and a Special Counsel subpoena seeking a large volume of records." *Id.* ¶ 27. To meet their processing deadlines for

all of these requests, staff sometimes work 12-hour days and weekends.  *Id.* ¶ 26.

Given present workload and resource limitations, 600 ppm is the maximum rate at which AOD may process Plaintiff's request while managing competing priorities, and Plaintiff provides no reason why the Court should not defer to this determination, which is supported by a detailed declaration.  *See Jud. Watch*, 2020 WL 6939807, at *2.

### B. Plaintiff fails to show that an increased rate of at least 1,000 pages per month is reasonable.

As an initial matter, Plaintiff argues for an increased processing rate based on shifting, but inapplicable, theories.  To start, Plaintiff appears to be arguing for an increased processing rate under a theory that NARA has failed to comply with the FOIA's default 20-day timeline for responding to a FOIA request.  *See* Pl.'s Br. 5-7.  But whether NARA has complied with that initial statutory timeline is irrelevant to the question before the Court.  The "penalty" for not responding within 20 days is merely a waiver of the FOIA's exhaustion requirement, not the extraordinary processing rate Plaintiff seeks here.  *Supra* p.8.

Elsewhere, Plaintiff invokes language from cases where courts ordered expedited processing under the standards set forth by the FOIA.  *See, e.g.*, Pl.'s Br. 7 (citing, *e.g.*, *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30 (D.D.C. 2006)); *id.* at 14 (distinguishing cases where courts denied expedited processing).  Those cases are inapposite because Plaintiff does not challenge NARA's denial of

Plaintiff's request for expedited processing.  Had Plaintiff done so, the question would be whether Plaintiff met the standards under the FOIA based on the record before the agency.  *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 274-75 (D.D.C. 2012).  Plaintiff's request for expedited processing would fail that *de novo* review, because the FOIA request's one-paragraph argument for expedited processing was factually unsupported and appears to be copied and pasted from an unrelated FOIA request to the State Department.[4]  *See* FOIA Request 4.  In any event, even if Plaintiff were entitled to expedited processing, the remedy would be for NARA to move Plaintiff's request to the front of the queue and process it "as soon as practicable."  *Landmark Legal Found.*, 910 F. Supp. 2d at 275.  For reasons already explained, NARA's 600-ppm rate is the maximum practicable rate.

　　None of Plaintiff's counterarguments shows that a processing rate of at least 1,000 ppm is either reasonable or practicable.  Plaintiff's primary argument is that a lower rate would deprive the documents of their public value because NARA's final production would be completed after the presidential election.  Pl.'s Br. 9.  That argument is unpersuasive for multiple reasons.  For one, if Plaintiff believed there

---

[4] Plaintiff also appears not to meet the statutory requirements for expedited processing based on a "compelling need," which applies to requests by "a person primarily engaged in disseminating information."  5 U.S.C. § 552(a)(6)(E)(v)(II).  Non-media organizations generally do not qualify unless "information dissemination is also their main activity and not merely incidental to other activities that are their actual, core purpose."  *Progress v. Consumer Fin. Prot. Bureau*, No. 17-cv-86, 2017 WL 1750263, at *4 (D.D.C. May 4, 2017) (collecting cases).

was urgency to receiving the records, it should have pursued its request with more diligence. As it stands, Plaintiff waited until June 2022 to submit a FOIA request for records from *eight years prior*—when President Biden was Vice President in 2006-2016. And when Plaintiff learned on June 24, 2022, that NARA had denied its one-paragraph request (directed at the State Department) for expedited processing but had instead placed the request in the complex queue, *see* Compl. ¶¶ 24, 31, Plaintiff did not administratively appeal. Instead, Plaintiff waited more than one year (or "[m]ore than 430 days", *id.* ¶ 46) to file suit in district court, with a Complaint that failed to allege any compelling need or seek expedited processing.

Additionally, in its brief, Plaintiff does not establish that the information it seeks is only valuable if NARA releases a complete set of records before the presidential election.[5] NARA will have made at least nine monthly releases of responsive records prior to the election, and Plaintiff will be able to study those records and disseminate its findings, starting in less than a month from the date of this filing. Moreover, NARA has offered to prioritize the records of greatest interest to Plaintiff. Contrary to its stated concerns about urgency, Plaintiff has not accepted that offer.

Plaintiff suggests that there is an urgent public interest in all of the emails

---

[5] Nor is Plaintiff even seeking such relief, as its proposal for a 1,000 ppm-processing rate would still result in productions being completed after the presidential election, thereby casting doubt on the reasons Plaintiff is seeking that processing rate.

responsive to its expansive request applying 221 search terms simply because they are "pseudonymous."  Pl.'s Br. at 10 & n.3.  But pseudonymous government email accounts (*e.g.*, Robert.L.Peters@pci.gov) are commonly used by high-level officials across administrations to avoid receiving a flood of emails.  *See Landmark Legal*, 959 F. Supp. 2d at 180 n.4 (explaining common practice of EPA administrators using a secondary email account).  In any event, Plaintiff will receive many of the documents requested before the election, and Plaintiff's desire to receive them faster does not support processing the records at a rate that is tantamount to expedited processing—a remedy that is "narrowly applied"[6] and "sparingly granted,"[7] and is one that Plaintiff neither seeks nor could satisfy on this record.  And even if Plaintiff had demonstrated extensive public interest in the records, that would be only one among a number of factors that the Court should consider when deciding the appropriate processing rate.  Here, it would not overcome the detrimental affect on NARA's mission and its ability to meet its obligations to other requesters, members of Congress, and Special Counsels.

Plaintiff next argues that courts "often order processing at rates of 1,000 PPM or greater," Pl.'s Br. 12, but the handful of cases Plaintiff cites either involved factors absent here—such as the need to provide a terminally ill plaintiff with records before

---

[6] *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001).
[7] *Elec. Privacy Info Ctr.*, 355 F. Supp. 2d at 104.

her expected date of passing,[8] egregious delays in processing,[9] or a grant of expedited processing[10]—or precede cases elaborating the equitable factors courts generally consider today.[11]

Third, Plaintiff argues that NARA has voluntarily agreed to process documents at over 1,000 ppm in other litigation, Pl.'s Br. 13, but the documents Plaintiff references do not support that assertion or show that such a rate is reasonable here. None of the orders Plaintiff cites from *Cato Institute*, *American Oversight*, or *Heritage Foundation* contain an agreed processing rate or even any commitment by NARA to process documents at a particular rate each month;

---

[8] *See Clemente v. FBI*, 71 F. Supp. 3d 262, 268-69 (D.D.C. 2014); *see also Seavey v. DOJ*, 266 F. Supp. 3d 241, 247-48 (D.D.C. 2017) (concluding that FBI did not provide sufficient information about processing capacity).

[9] *Villanueva*, 2021 WL 5882995, at *8 (noting that only 500 pages had been released over 3.5 years).

[10] *Elec. Privacy Info. Ctr. v. DOJ*, No. 05-cv-845, 2005 U.S. Dist. LEXIS 40318, *2-4 (D.D.C. Nov. 16, 2005) (after FBI granted plaintiff's request for expedited processing, concluding that FBI had released an "incredibly small number of pages"—about 250—in eight months, and thus ordering faster processing rate); *Open Soc'y Just. Initiative v. CIA*, 399 F. Supp. 3d 161, 164-65 (S.D.N.Y. 2019) (ordering increased processing rate, and 5-year processing timeline, because plaintiff met the statutory requirements for expedited processing); *ACLU v. Dep't of Def.*, 339 F. Supp. 2d 501, 505 (S.D.N.Y. 2004) (after granting motion for preliminary injunction, ordering increased processing rate where "[m]any of the documents in question ha[d] been produced to others, they [we]re known to exist, and degrees of classification ha[d] been determined for many of them," and "[n]early one year ha[d] passed since the documents were first requested," but stating that the agency could move to modify the processing schedule if it could not in good faith comply).

[11] *See Jud. Watch, Inc. v. U.S. Dep't of Energy*, 191 F. Supp. 2d 138 (D.D.C. 2002) (not addressing any of the equitable factors courts now generally consider); *Nat. Res. Def. Council v. Dep't of Energy*, 191 F. Supp. 2d 41 (D.D.C. 2002) (same).

instead, they simply update the courts on the status of NARA's response.[12]
Moreover, those cases involve requests before NARA components other than AOD,
the component processing Plaintiff's request here.   2d Fidler Decl. ¶ 37.   The
capacity of those components—based on their own staffing, FOIA queues,
resources, and litigation demands—is irrelevant to determining AOD's capacity.
And *American Oversight* and *Heritage Foundation* concerned the same documents
that were being processed in seven different cases simultaneously (at a rate below
500 ppm per lawsuit), using a categorical approach unavailable here.   *Id* ¶ 38.

*America First* (filed one year before Plaintiff's case) also fails to support
Plaintiff's proposed rate.   That case concerned three separate FOIA requests, each
of which was being processed at a rate of less than 500 ppm.   *Id.* ¶ 40.   And the
parties' October 2022 agreement regarding processing rate arose in a different
factual context from today.   *Id.* ¶ 41.   In particular, it preceded the 87% increase in
special access requests that AOD experienced in 2023, which is placing extra strain
on AOD's resources.[13]   *Id.* ¶ 41.

Finally, Plaintiff equates the burdens it seeks to impose on NARA to mere
"[a]dministrative headaches" and "logistical difficulties."   Pl.'s Br. 15-16.   Yet the

---

[12] *See* Pl.'s Br. 13 (citing *Cato Inst. v. NARA*, No. 22-1746 (D.D.C.), Doc. 8 at 1-2
& Doc. 9 at 2; *Am. Oversight v. NARA*, No. 22-1529 (D.D.C.), Doc. 18 at 1-2;
*Heritage Found. v. NARA*, No. 22-2671 (D.D.C.), Doc. 18 at 1-2).
[13] Additionally, since there is a larger number of responsive records in *America First*,
the processing timeline is years longer than in this lawsuit.   *Id.* ¶ 40.

work required to contemporaneously respond to multiple FOIA requests, congressional requests, and expansive Special Counsel subpoenas is not a matter of "logistical difficult[y]"—it is a matter of NARA equitably allocating its limited resources in the midst of unprecedented workloads, in order to respond to all requesters efficiently while ensuring that a minority of large requests do not prejudice other "requesters patiently waiting their turn." *Harrington*, 581 F. Supp. 3d at 150. Nor does *Washington v. NARA* support Plaintiff's contention that courts have rejected such concerns from NARA in other cases. *See* No. 21-cv-00565, 2022 WL 823551, at *4 (W.D. Wash. Mar. 18, 2022). The dispute in that case arose in 2021, *id.* at *1 (noting the FOIA request was from February 2021)—years before the present uptick in requests affecting NARA's processing capacity here. In any event, while the court there evaluated the equitable factors relevant to the appropriate processing rate, the analysis was ultimately dicta—in the end, the court found that the dispute over the appropriate rate had become "essentially moot," because NARA had projected that it would be able to complete productions *before* the deadline set by the court's order. *Id.* at *5. Thus, that court's discussion of the factual context several years ago, when the dispute over the appropriate rate had become moot, provides no guide for the appropriate processing rate here.

In short, Plaintiff fails to locate support in precedent or other cases involving NARA for imposing a burdensome 1,000-ppm processing rate, where doing so

would substantially interfere with NARA's ability to efficiently and equitably respond to a growing number of requests—from FOIA litigants, Congress, and Special Counsels—for Presidential and Vice Presidential records. The Court should allow NARA to continue processing at the reasonable rate of 600 ppm.

## II. Producing *Vaughn* Indexes Piecemeal Would Serve no Litigation Purpose but Would Interfere with Document Processing.

At the same time Plaintiff asks the Court to increase NARA's processing rate, it asks the Court to compel NARA "to provide *Vaughn* indices contemporaneous with any production or on some periodic basis." Pl.'s Br. 21. Imposing such a requirement on NARA would not further the purposes served by a *Vaughn* index, which is to aid the Court's resolution of a plaintiff's challenges to withholdings at summary judgment. It would only frustrate efficient processing and production of documents responsive to Plaintiff's request. None of the cases Plaintiff cites supports imposing such a novel and burdensome requirement on NARA, and the Court should reject it.

Importantly, the FOIA does not give requesters a right to receive a Vaughn index, either in the administrative proceedings or in district court. *See Schwarz v. U.S. Dep't of Treasury*, 131 F. Supp. 2d 142, 147 (D.D.C. 2000), *aff'd,* No. 00-5453, 2001 WL 674636 (D.C. Cir. May 10, 2001) (per curiam). Rather, the index is a judicially created tool that, in certain cases, may "assist the trial court in its *de novo* review" of agency withholdings at summary judgment. *See Ferguson v. FBI*, 729 F.

19

Supp. 1009, 1012 (S.D.N.Y. 1990); *see also Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993).  Through the *Vaughn* index, the agency identifies "each document withheld" and "the statutory exemption claimed, and [provides] a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption."  *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991) (citing cases).  However, a *Vaughn* index is not necessary in every case—it is just one of several tools an agency defendant may use to justify its claimed exemptions at summary judgment.  *Miscavige*, 2 F.3d at 368 (discussing other tools).

Consistent with this purpose, standard practice is for an agency defendant to include a *Vaughn* index, or other supporting materials, with its motion for summary judgment.  *Id.* at 369; *see also CREW*, 711 F.3d at 187 n.5 (citing cases).  In certain circumstances, an agency may deviate from the standard practice when doing so will facilitate resolution of the case.  For instance, as noted in Defendant's JSR position, agencies sometimes provide the plaintiff with a *Vaughn* index ahead of filing a dispositive motion—but they do so only after productions are complete, and for withholdings the plaintiff indicates it wants to challenge, to narrow disputes relevant to dispositive briefing.  *See* JSR 22.  Likewise, courts sometimes order agencies to produce an index before filing an opening summary judgment brief—but (as the cases Plaintiff cites illustrate, *see* Pl.'s Br. 19) they generally do so when necessary to provide the plaintiff with adequate time "to formulate [its] . . . case," or because

it might "facilitate a narrowing of the issues and a reduction in the number of documents as to which there is a bonafide dispute." *Keeper of Mountains Found. v. DOJ*, No. 06-cv-098, 2006 WL 1666262, at *3 (S.D.W. Va. June 14, 2006) (ordering production after the agency produced responsive documents but before it moved for summary judgment); *see also California ex rel. Brown v. EPA*, No. 08-0735, 2008 U.S. Dist. LEXIS 62528, at *10 (N.D. Cal. Aug. 1, 2008) (granting a motion to compel a *Vaughn* index so that the plaintiff could "review it prior to summary judgment"); *Providence J. Co. v. U.S. Dep't of Army*, 769 F. Supp. 67, 69 (D.R.I. 1991) (same).

None of the cases supports Plaintiff's request here, which is not simply for a *Vaughn* index prior to summary judgment briefing but instead for a piecemeal index in real time—that is, accompanying each of NARA's productions, or on some other intermittent basis during productions. That would result in NARA having to draft *Vaughn* information for each and every redaction it makes in these documents, whether or not Plaintiff intends to challenge them. That would be a waste of NARA's limited resources since Plaintiff may not challenge *any* withholdings at the end of production, let alone *all* of them.

While Plaintiff claims to seek to challenge withholdings as the productions are made, that too is an extraordinary request and not the way FOIA cases are litigated. FOIA cases are generally "handled on motions for summary judgment[]

*once the documents in issue are properly identified*," 2 F.3d at 369 (emphasis added), that is, after all the documents have been produced.  Bifurcated, piecemeal briefing of withholdings is the exception in FOIA cases, as Plaintiff's own cases demonstrate.  In *Washington v. NARA*, for example, after NARA made some initial productions that comprised "only a fraction of the documents involved in [the] case," the plaintiff moved for summary judgment to challenge those withholdings, demanding production of a *Vaughn* index to understand the basis for the claimed exemptions.  *See* 2022 WL 823551, at *5.  The court denied the motion for summary judgment and the request for a *Vaughn* index as premature, reasoning that "mak[ing] exemption determinations on a piecemeal basis . . . would be extremely inefficient." *Id.*  Plaintiff's request for piecemeal production of a *Vaughn* index with NARA's productions is even more premature—NARA has not even begun producing documents, and whether it will withhold information, and if so on what basis, is not yet known.

Plaintiff references *two* cases where a court ordered an agency to produce a *Vaughn* index in stages, but those orders arose in unique factual circumstances and do not support Plaintiff's request.  The ruling in *Villanueva*, Plaintiff's primary supporting case, *see* Pl.'s Br. 19, arose *after* the court had denied the agency's motion for summary judgment because the agency failed to provide sufficient information with its motion for the court to assess the appropriateness of its claimed

exemptions.  *Villanueva v. DOJ*, No. 19-23452, 2021 WL 5882995, at *2 (S.D. Fla. Dec. 13, 2021).  In the aftermath of that ruling, the agency decided it would no longer withhold thousands of pages of documents pursuant to a FOIA exemption.  *Id.*  To efficiently resolve remaining disputes after the initial round of summary judgment briefing, the court ordered the agency to produce those documents in four separate rolling productions over the next four months, with a *Vaughn* index to accompany each production.  *Id.* at *4.  *Villanueva* does not support piecemeal production of a *Vaughn* index in cases like this one, where the parties have not briefed summary judgment and there are presently no disputed exemptions for the Court to resolve.

Ferguson is also inapposite.  *See* 729 F. Supp. 1009.  There, the court set deadlines for the agency to respond and produced *Vaughn* indexes for specific portions of two FOIA requests.  *Id.* at 1010-11.  The court noted that it had denied the plaintiff's earlier request for a *Vaughn* index pertaining to one of the requests as premature, because the agency had not made decisions about whether to withhold portions of the material.  *Id.* at 1012.  But after the agency produced responsive documents and decided not "to disclose certain documents," to which the plaintiff objected, the court concluded a *Vaughn* was necessary "to aid . . . in [its] mammoth task of de novo review."  *Id.*  Again, NARA has not yet produced responsive documents and there are no challenged withholdings ripe for the Court's review.

Nor does Plaintiff's speculation about NARA's forthcoming response to its

FOIA request support its request for piecemeal, interim *Vaughn* indexes accompanying rolling productions. Plaintiff asserts that NARA will likely withhold documents because of "a constitutional privilege," Pl.'s Br. at 20, but this is pure speculation at this stage of the processing. And Plaintiff's suggestion that the Court may resolve the applicability of any particular exemption to some unspecified set of documents at some unspecified point in time (other than "early") before document production is complete, *see id.* 20-21, is unavailing. The applicability of any particular privilege to any particular document would be highly fact specific and incapable of resolution advance of NARA's response. *See Nat. Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1109 (C.D. Cal. 2005).

Plaintiff also argues that, absent intermittent production of a partial *Vaughn* index, Plaintiff will have no way of knowing "*if* [NARA] has withheld any documents" for many years. Pl.'s Br. 21 (emphasis added). But as Defendant explained in its JSR position, and as is standard practice in any FOIA case, NARA specifies with every production whether it has withheld any document in part or in full and on what basis. JSR 22. Specifically, the applicable exemption is noted in a text box over every redaction, and a "withdrawal sheet" containing a description of the document and the exemptions claimed is produced for every document withheld in part or in full. *Id.*; *see also* 2d Fidler Decl. ¶ 27. After the parties filed their JSR on December 8, 2023, Defendant provided Plaintiff with several examples of

withdrawal sheets produced in other cases.  Those examples are also attached to this filing.  *See* Sample Withdrawal Sheets (attached as Ex. 3).

Finally, it bears emphasis that creating and "[p]roducing a properly detailed *Vaughn* Index is a 'considerable burden.'"  *Nat. Res. Def. Council*, 388 F. Supp. 2d at 1109 (citation omitted).  Because the same staff processing Plaintiff's request also would be preparing any *Vaughn* index, *see* 2d Fidler Decl. ¶ 42, piecemeal production of an index during document processing would significantly interfere with NARA's ability to respond to Plaintiff's request in a timely manner.  Plaintiff fails to acknowledge the contradictory nature of its demand for a faster processing rate and ongoing productions of a *Vaughn* index with document productions.  Instead, Plaintiff dismisses the considerable burden of preparing a *Vaughn* index as a "mere administrative inconvenience" that "does not excuse FOIA's requirements."  Pl.'s Br. 21.  But the FOIA does require production of a *Vaughn* index, and thus not providing a piecemeal *Vaughn* index does not violate any "FOIA[] requirement[]."

Plaintiff's request for piecemeal, interim *Vaughn* indexes while production is ongoing would only burden NARA's ability to process the records, not aid the litigation, and should be denied.

## CONCLUSION

The Court should allow NARA to continue processing documents at a rate of 600 ppm and deny Plaintiff's request for piecemeal, interim *Vaughn* indexes.

Dated:  January 23, 2024        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Kyla M. Snow*
KYLA M. SNOW
Ohio Bar No. 96662
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20005
Email: kyla.snow@usdoj.gov
Phone: (202) 514-3259
Fax: (202) 616-8460

*Counsel for Defendant*

## **CERTIFICATION**

Counsel hereby certifies that this Brief has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).