# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SOUTHEASTERN LEGAL FOUNDATION,<br><br>　　*Plaintiff*,<br>　v.<br><br>THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,<br><br>　　*Defendant*. | Case No. 23-cv-3819 |

**DECLARATION OF ELIZABETH FIDLER**

I, Elizabeth Fidler, under 28 U.S.C. § 1746, hereby declare and state as follows:

1. I currently serve as the Acting Director of the Archival Operations Division (the "Division" or the "Archival Operations Division") of the Legislative Archives, Presidential Libraries, and Museum Services branch of the National Archives and Records Administration (NARA). I have been employed by NARA for 30 years. From 1997 to 2020, I worked with the Presidential Materials Division (the predecessor to the Archival Operations Division), serving my last 19 years in that unit as a senior policy archivist. I have worked with Presidential and Vice Presidential records for 23 years of my NARA career. I hold a bachelor's degree in history from the University of Maryland at Baltimore County.

2. I am responsible for administering records requests for Presidential and Vice Presidential records that have been transferred into NARA's custody in accordance with the Presidential Records Act (PRA) of 1978, as amended, 44 U.S.C. §§ 2201-2209. My office has specific responsibility for Vice Presidential records from the Clinton, George W. Bush, Obama, and Trump administrations, as well as selected classified Presidential record collections from the Reagan through Obama administrations.

3. The statements contained in this declaration are based upon my personal knowledge, upon information furnished to me in the course of my official duties, and upon conclusions and determinations reached and made in accordance therewith.

**The Presidential Records Act**

4. The PRA establishes public ownership of all Presidential records and requires that such records be transferred into NARA's custody and control when a President leaves office.  44 U.S.C. § 2203(g).

5. Sections 2208 and 2207 of the PRA require that NARA provide former and incumbent Presidents and Vice Presidents notice and an opportunity to assert constitutionally based privilege claims before NARA releases Presidential records to the public. *Id.* §§ 2208, 2207. Specifically, Section 2208 states that before the Archivist may release Presidential records to the public, the Archivist

must first notify the incumbent President and the President who was in office when the records were created. *Id.* § 2208(a)(1)(A). Whenever the Archivist intends to release Vice Presidential records, the Archivist must also notify the Vice President who was in office at the time the records were created. *See id.* § 2207 (extending the notice requirements to Vice Presidential records).

6. The Archivist must then provide a period of 60 working days for the incumbent President, former President, and, if applicable, former Vice President, to assert any claim of constitutionally-based privilege against disclosure. *Id.* § 2208(a)(3)(A). The former or incumbent President may choose to extend this period once, for an additional 30 working days, "by filing with the Archivist a statement that such an extension is necessary to allow an adequate review of the record." *Id.* § 2208(a)(3)(B).

**Plaintiff's Freedom of Information Act (FOIA) Request**

7. On June 9, 2022, the Archival Operations Division received a FOIA request from Southeastern Legal Foundation (SLF) seeking "all emails President Joe Biden preserved through the National Archives and Records Administration from his time as vice president for the following email addresses: robinware456@gmail.com, JRBWare@gmail.com and Robert.L.Peters@pci.gov." The request also seeks "any correspondence between Joe Biden and/or his legal or government representatives concerning

3

the use of these emails and preservation of records from them from Jan. 1, 2009 through present."

8. The Archival Operations Division acknowledged the request and assigned it tracking number 2022-0113-F.

9. SLF argued that the request was entitled to expedited processing for the following reasons:

> We also request that this FOIA be expedited under the law's compelling need provisions. As a journalist, Mr. Solomon has been primarily engaged in disseminating information about the Russia collusion, Hunter Biden and Ukraine investigations conducted by the FBI, CIA and Congress and these documents provide compelling and urgent materials that will inform the public concerning actual or alleged federal government activity and possible wrongdoing. Additionally, Southeastern Legal Foundation has been seeking related records for years from the State Department. Given the State Department's continued delay and the public importance of this information, State Department should expedite this request.

10. The Division found that this argument failed to demonstrate that expedition was warranted under NARA's FOIA regulations, for two reasons. First, the argument about why the State Department should expedite this request was irrelevant, because NARA is not the State Department, and the State Department's processing history has no relation to this request. Second, the request did not provide any evidence or information to support its conclusory assertion that "these documents provide compelling and urgent materials that

4

will inform the public concerning actual or alleged federal government activity and possible wrongdoing."

11. Plaintiff did not administratively challenge this determination.

**NARA's Processing of Plaintiff's FOIA Request**

12. NARA conducted a search for documents potentially responsive to Plaintiff's FOIA request, which yielded more than 5,000 hits. NARA began processing those documents at a rate of roughly 500 pages per month.

13. At the outset of the lawsuit, to facilitate the parties' agreement on a processing rate, NARA attempted to estimate the number of pages of responsive records. Since NARA does not have the technological capacity to electronically generate this information, it sampled a very limited subset of documents potentially responsive to Plaintiff's original request, and initially estimated that there were approximately 16 pages per email. As noted below, NARA later determined that this estimate vastly overstated the average number of responsive pages per email.

14. Plaintiff later agreed to narrow its request by applying a list of keywords. NARA conducted another search for potentially responsive documents based on their narrowing, which yielded approximately 3,000 possible hits.

15. Based on a sampling of approximately half of those 3,000 emails, NARA estimates that there are roughly six pages per email, for an estimated total of

5

18,000 pages potentially responsive to the narrowed request. That more accurate estimate also indicates that there are roughly 32,000 pages (rather than 82,000) potentially responsive to the request as originally written, without search terms applied.

16. After Plaintiff narrowed its request, NARA began processing responsive documents at a rate of approximately 600 pages per month.

17. On October 31, 2023, after processing an initial tranche of documents, NARA made its first PRA notification. NARA processed two more tranches of documents in November and December and made its second and third PRA notifications on November 30, 2023 and December 28, 2023. On January 31, 2024, NARA will make its fourth PRA notification.

18. NARA will make each subsequent PRA notification for the next batch of records no later than the last day of each month thereafter, unless that date falls on a weekend or holiday, in which case the PRA notification will occur on the next working day. Pursuant to the PRA, NARA will produce any responsive, non-exempt records to SLF either 70 working days or 100 working days (if the former or incumbent President invokes the 30 working-day extension) after each notification. If the end of the 70- to 100-working-day period falls on a weekend or a holiday, NARA will produce the records the next working day.

19. Following these timelines, NARA expects to make its first production of any non-exempt responsive records from the first tranche of documents reviewed in October by February 14, 2024 at the latest (this is 70 working days after the corresponding notification).

**Archival Operations Division Processing Capacity and Workload**

20. The Archival Operations Division handles all FOIA and special access requests for four Vice Presidential collections, including that of former Vice President Joseph Biden. A "special access request" is a request from incumbent administrations, courts (including subpoenas), Congress or designated PRA representatives for access to Presidential Records, pursuant to 44 U.S.C § 2205. In addition to those responsibilities, the Archival Operations Division is responsible for the classified electronic records of former Presidents George W. Bush and Barack Obama, and other select series dating back to former President Ronald Reagan.

21. Starting in August of 2022, the Division's workload has increased substantially compared with its ordinary workload. This interest expanded with the appointment of Special Counsels to investigate former President Trump, President Biden, and Hunter Biden. This workload increase has consisted of a large uptick in litigation, special access requests, and FOIA requests.

22. The Archival Operations Division has four processing queues: in/out, simple, complex, and expedited. The in/out, simple, and complex queues are organized as follows:

    a. In/out - fewer than 500 textual pages, 100 electronic hits, or 100 images

    b. Simple - 500 - 10,000 textual pages, 100 - 2,000 electronic record hits, 100 - 1,000 images, or 10 videos.

    c. Complex - more than 10,000 textual pages, 2,000 electronic record hits, 1,000 images, or 10 videos.

23. Although the FOIA contemplates that requests will be processed in the order in which they are received, the Division has had to devote 100 percent of its processing capacity to court-ordered litigation schedules and special access requests related to Biden's Vice-Presidential records. As a result, since the fall of 2022, the Division has not been able to process a single FOIA request in its complex queue. NARA regrets the unfairness this has caused to other requesters, many of whose requests predated the requests in litigation. The agency has only finite resources and limited staff with expertise in the Presidential Records Act, however, and has made its best efforts to expand those resources as quickly as possible.

24. Prior to the fall of 2023, the Division had two staff members and a director. In the fall of 2023, the Division hired two new archivists to help manage its

8

workload. Due to the complexities of applying the Presidential Records Act, however, it will take several months of ramp up time before both new archivists are fully trained.

25. Consequently, the Division currently has only five archivists available for processing records in response to FOIA and other access requests. Due to competing work obligations, the archivists can spend no more than 70 percent of their work time responding to FOIA and other access requests.

26. To meet their deadlines, Division staff have sometimes worked 12 hour days and weekends.

27. This overall processing capacity is currently divided among four monthly FOIA litigation processing schedules, one large multi-part document request from the House Oversight Committee, a special access request from the incumbent administration, and a Special Counsel subpoena seeking a large volume of records.

28. As mentioned, the Division has experienced a sharp increase in the number of special access requests. In 2023, the Division received 22 special access requests, 11 of which were high-volume requests. In 2021 and 2022, it received only 3 special access requests each year. The 22 special access requests received by the AOD in 2023 included eight subpoenas. In 2022 and 2021, the Division did not receive any subpoenas.

29. In 2023, the Division received 84 FOIA requests. In 2022, it received 109 FOIA requests, compared with 23 FOIA requests in 2021. The number of FOIA requests received in 2021 is much more typical for the Division.

30. Over the next year, as the presidential election approaches, we anticipate that we will receive at least as many access requests as we did last year.

31. The number of requests does not necessarily equate to the amount of work hours to process. A single request could have multiple parts and a very expansive scope.

32. The Division currently has 126 pending FOIA requests for approximately 313,528 textual pages, 396,103 email messages and electronic files (estimated at 3.7 million equivalent pages), and 38,581 photographs and audiovisual tapes from Vice-Presidential records in its legal custody, for a total backlog of 748,212 files. In addition to this workload, the Division is also handling a backlog of mandatory declassification requests and FOIA requests for classified Presidential records in its physical custody.

33. If the Division receives access requests at the same rate that it did in fiscal year 2023, I anticipate that we will receive another 100 FOIA and access requests in fiscal year 2024.[1]

---

[1] The Archival Operations Division's prior declaration erroneously stated that the Division anticipated receiving another 40 FOIA and access requests in fiscal year 2024.

10

34. Considering the Division's backlog, staffing capacity, resource constraints, and workload, the Archival Operations Division can process no more than 100 emails, or 600 pages, per month for Plaintiff's FOIA request. This is more than double NARA's standard processing rate, which is 250 pages per month.

35. Processing Plaintiff's request at a rate exceeding 600 pages (which is the equivalent of 100 electronic files) per month would have a significant adverse impact on the Archival Operations Division and on other requestors, many of whose requests were filed long before Plaintiff's. The Division would be unable to address its oldest pending FOIA requests received in 2016 and 2017, to meet timeliness standards for responding to written requests from the public, and to engage in agency-wide initiatives and priorities.

36. A processing rate of 1,000 pages per month would negatively impact NARA's ability to respond to special access requests, including Special Counsel subpoenas and access requests submitted by Congressional oversight and other committees.

**Processing Rates in Other Litigation**

37. The FOIA requests at issue in *Cato Inst. v. NARA*, No. 22-1746 (D.D.C.), *American Oversight v. NARA*, No. 22-1529 (D.D.C.), and *Heritage Foundation v. NARA*, No. 22-2671 (D.D.C.), are being processed by NARA components other than AOD, the component processing Plaintiff's request here. Each

NARA component has its own staffing, FOIA queues, resources, and litigation demands.

38. The cases *American Oversight* and *Heritage Foundation* differ in important ways from Plaintiff's request. *American Oversight* and *Heritage Foundation* are two of seven lawsuits filed over FOIA requests for operational records relating to 15 boxes of materials from Mar-a-Lago. NARA has received more than 50 overlapping FOIA requests seeking such records. NARA's Office of General Counsel, which processes requests for operational records, determined that the most efficient way to respond to the 50 requests was to identify commonly-requested records and process them category by category, rather than request by request. When NARA processes a category of records each month, it processes the same exact records for all 50 requesters and seven litigants. Thus, splitting the production across all seven lawsuits, NARA's workload is far less than 500 pages per lawsuit per month.

39. The Archival Operations Division has received somewhat overlapping FOIA and congressional requests for President Biden's Vice-Presidential records.  The Division thus considered whether a similar categorical processing approach would be possible for requests for such records, but determined that it was not feasible, due to irreconcilable differences in the parameters of each request and priorities expressed by the requesters. The overlap across the records responsive

to these requests, yet differing preferences and priorities for each request, present additional challenges here and require detailed and painstaking notes to facilitate the PRA notification process (as the legal representatives of the former and incumbent Presidents and Vice Presidents are notified of NARA's proposed openings).

40. *America First Legal Foundation v. NARA*, 1:22-cv-02713, which was filed in September 2022, also differs in important respects from Plaintiff's. That lawsuit involves three FOIA requests, and each request is being processed at a rate of 417 pages per month, for a total of 1,250 pages per month for all three requests in the aggregate. Plaintiff's case, on the other hand, involves only one FOIA request, and therefore the Division is processing potentially responsive documents at a higher rate for Plaintiff's request as compared to the three separate requests at issue in *America First Legal*. Additionally, since there is a larger number of responsive records in *America First Legal Foundation*, the processing timeline is years longer than in this lawsuit.

41. Additionally, *America First Legal Foundation* was filed in September of 2022, necessitating a decision about the processing rate in October of 2022—a time when the Division had not yet felt the full impact of the extraordinary and unprecedented uptick in special access requests, including Special Counsel subpoenas. NARA's decisions about what processing rates are feasible and

appropriate depend on the agency's workload and processing capacity at the time the decision is made. Since the processing rate in *America First Legal Foundation* was decided, the Division received 22 additional special access requests, an increase of 87 percent from the previous year.

**Capacity to Produce a Piecemeal *Vaughn* Index**

42. The Division is not capable of providing a rolling *Vaughn* index each month at the same time that it processes responsive records at a rate of 600 pages, or 100 emails, per month. The Division's archivists are the only NARA staff members with the knowledge and expertise needed to produce *Vaughn* indices for the responsive records. Additionally, requiring the Division to produce piecemeal *Vaughn* indices would necessarily divert time and resources away from processing Plaintiff's request (and other FOIA requests).

43. With every document production, the Archival Operations Division also produces a "withdrawal sheet" that corresponds to every redaction or non-disclosed document.  The withdrawal sheet generally provides basic metadata and a brief description of the document and reason for non-disclosure. A withdrawal sheet is less descriptive than a *Vaughn* index, but it may provide the Plaintiff with some additional information about the documents and basis for withholdings.

**Alternative Approaches**

44. Plaintiff failed to demonstrate that its request was entitled to expedition, and the Archival Operations Division properly placed the request in the complex queue, where requests are processed on a first-in, first-out basis. When Plaintiff filed this lawsuit, NARA moved Plaintiff's request to the front of the queue with other requests in litigation. The Division appreciates the goals of the Freedom of Information Act and is committed to doing everything reasonably within its power to deliver on the FOIA's promises. To that end, the Archival Operations Division has communicated to Plaintiff that it is willing to work with Plaintiff to explore alternative approaches to addressing Plaintiff's concerns about the volume of potentially responsive records. First, NARA has invited Plaintiff to engage in discussions about narrowing the scope of its requests so that they are more targeted to the information Plaintiff is seeking. Second, NARA has invited Plaintiff to prioritize its requests, so that the Division can first process the information that is most important to Plaintiff. More specifically, Plaintiff could mirror the approach used in *Blumenthal v. NARA*, in which the plaintiffs identified tiers of information and NARA processed those tranches in the order requested by the plaintiffs at a rate of 250 documents per month.[2]

---

[2] Nat'l Archives and Records Admin*., 2018-0263-F: Emails Processed in Response to Blumenthal v. NARA FOIA Litigation*, https://www.georgewbushlibrary.gov/research/finding-aids/foia-requests/2018-0263-f-emails-processed-response-blumenthal-v-nara-foia-litigation.

45. As explained above, Plaintiff has agreed to narrow its request by applying more than 200 search terms. Plaintiff has not responded to NARA's offer to discuss processing priorities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of January, 2024

_____
ELIZABETH FIDLER